Good morning, your honors. May it please the court. James Vani was a loan officer. His job was to submit loan applications to lenders. In the heady days of 2007 and early 2008, the information provided to lenders did not have to be verified. And thus, Mr. Vani did not verify the information provided by the true culprit of this case, Mr. Okalaja. The prosecution portrayed James Vani as a rogue loan officer who threw caution to the wind in signing off on the information fed by Okalaja. Well, reality was quite different. And this reality would have been explained by expert Neil Fenley. Mr. Fenley, with 15 years of recognition, experience, and publications to quote the district court, would have explained the reality. And the mortgage loan process and the fact that the information did not have to be verified before it was submitted to lenders. Counsel, even if that's what he had been allowed to testify to, if he had been allowed to testify to the fact that there was no prevailing practice in the industry at the time that caused anybody to have to go follow up on the information they'd been provided, is it not the case that Mr. Vani did, in his statement to the FBI, indicate that he knew that the information was false? He somehow came to know it, and he submitted the applications and signed off on them anyway? Your Honor, I believe that the statement to Agent McDonald is certainly damaging to our case, but it's not debilitating. For the reason that the statement is somewhat ambiguous, in that he does not, Mr. Vani does not explicitly say when he knew that this information was false. So I would argue that that statement and the fact that he did not say when he knew that this information was false, coupled with Mr. Fenley's testimony, if it had been admitted, would show, or at least allow the jury to see that Mr. Vani did not have to, on his own, independently verify this information. That he didn't have to, or that people just weren't? I would say both, Your Honor. How does one say the latter, since the documents he signed included statements that he had verified the information? Well, Your Honor, the applications themselves... The expert testimony your client wished to present was that agents didn't verify, not testimony that they shouldn't verify or that they weren't required to verify. It would have been like testimony that people drive 55 miles an hour on Lakeshore Drive, which is true, but it wouldn't change the fact that the speed limit is 45. Certainly, Your Honor, and along the analogy of the speeding example, this is a specific intent offense, and specific intent, obviously... Yeah, people who drive 55 miles an hour on Lakeshore Drive know two things. First, that that's the normal speed of traffic when it's not 60, and they also know that that's illegal. Yes, Your Honor. But if they drive at the legal rate, they'll be involved in an accident because somebody will run right up their rear bumper. Right? True. But it wouldn't be a defense in a criminal prosecution. No, it would not, Your Honor. But as far as Mr. Funley goes, again, we sought this testimony because, again, it would provide some context. I understand how information about the defendant's own training would be relevant here, but that's not what Funley was prepared to testify about, is it? Yes and no. Let me ask, where is the last best offer of proof as to what Funley was going to say? It's a little hard to tell here. Certainly, Your Honor. I think the record would be better if there had been a proffer. But alas. Yes. So I would say the disclosure, and I think it's, I believe, docket entry 88. And he attaches the CB, which, again, I recognize could have been better fleshed out. Unfortunately, it was not. So he's talking about general practices, but he doesn't have anything to say about Mr. Vanni. Well, and that's where I'm saying yes and no. He, being Mr. Funley, has experience and would have testified about three of the specific lenders, Citibank, Homecoming, and I believe it was Washington Mutual. And those are lenders that Mr. Vanni dealt with. Did Mr. Vanni testify that he was trained not to verify? No, Your Honor. Not explicitly. Not explicitly. There's testimony from Mr. Vanni that implies that he simply rubber-stamped information provided by the loan officers, by Mr. Okolodge, but I would say there's no explicit testimony, unfortunately, that he was not trained in that way. As to the insufficiency of evidence issue, this case is unique because James Vanni was essentially doing his job. He was paid to submit these loan applications, and the mastermind of this whole scheme, Mr. Okolodge, never testified. Well, he wasn't paid to submit false loan applications. I'm sorry? He wasn't paid to submit false loan applications. Well, maybe he was. He was not, Your Honor. How did the bonuses he was paid by the other folks here compare with his usual compensation? I believe Mr. Vanni would receive 1% to 3% of, I believe it's called the yield premium. So the bonus, he would have been paid a regular fee, as he would an all. He took $10,000 to move these to the front of the line and perhaps look the other way. That's what the jury found. How does that compare to the other compensation he would have received routinely? Well, I think it depends on the size of the loan. Okay. So an example, a hint, I'm just trying to get the order of magnitude. Sure. And that's why I would say it's 1% to 3%. The base value of the loan? I don't think it was that high. That's why I would say a term was called the YSP, a yield spread premium. And it was 1% to 3%, somewhere around there, of that amount. So the bonus. Is that hundreds of dollars? Is it tens of thousands of dollars? I don't think it was that much. I think it was probably somewhere in between. I think it was approximately a couple thousand. And, frankly, Your Honor, I don't know if that was explicitly in the record. Thank you. So as far as the bonus goes, certainly that was a $2,000 per file bonus that Mr. Bonney was paid. And given the context and given how much ultimately Mr. Okolodge made off this scheme and off his other multitude of schemes, the $2,000 payment was not significant in the grand scheme of things. And going to the insufficiency of evidence again, Mr. Okolodge never testified. There's no evidence of interaction between them other than what Mr. Rotivi says. And Mr. Rotivi simply says, you know, I gave Mr. Bonney money from Mr. Okolodge. I was there at the house with Mr. Okolodge and Mr. Bonney, but he has no idea what the other two talked about. So this case is somewhat unique in that regard where the mastermind of this scheme, who pleads guilty, is nowhere to be found. And we have no idea other than speculation as to what Mr. Bonney and Mr. Okolodge discussed. We do have, though, for Rule 29 purposes, we have a lot of circumstantial evidence, but we've also got Mr. Bonney's statement to Agent McDonald, right, which almost quotes the ostrich instruction, right? So why isn't that enough for Rule 29 purposes? I understand you want to say it didn't foreclose an acquittal, but that's not what happened here. Certainly, and I would concede it does echo that instruction. As far as the statement goes, again, it's damaging, but it's not debilitating because, you know, it's somewhat ambiguous in that he did not know exactly when or he's not clear as to when he knew that this information was false or may have been false. And that's in addition to his participation in the scheme. That statement, confession, if you want to call it that, goes more to the second element of wire fraud and not necessarily the first, the participation in the scheme. And that goes back to my earlier point that the prosecution never presented any evidence from Mr. Okolodge testifying, you know, here was what I told Mr. Bonney to do, we met on this occasion, we planned this. There's none of that testimony. But the Rule 29 standard is not that the government somehow has to bring in every piece of proof it possibly could have marshaled, right? Sure. I mean, the standard was the evidence sufficient that a reasonable jury could come to the conclusion that it did. And it isn't just the agents, the statement to the agents, right? I mean, the letter that got faxed that was purportedly from Mr. Galindo that had some information in it that wasn't altogether accurate, the way the applications themselves were submitted, the loan documents themselves, which had significant amounts of false information, and even if he didn't go track them down, one would think he would at least look at them. There's more evidence here just than the statement to the agent, right? Certainly, Your Honor. But along those lines, there is no evidence regarding the interaction between Mr. Bonney and any of the straw buyers. Mr. Galindo, Mr. Torres, Mr. Semenuk, no evidence regarding anything between those two. No evidence that any of those individuals had any discussions. And, again, no evidence that Mr. Bonney and Mr. Okolodja discussed these loan applications. So I would concede that it's a high hurdle at this point, but, again, given the unique nature of this case and the fact that Mr. Bonney was doing this as part of his job and was being paid to submit loan applications as part of his job, I would ask the Court to consider those factors. And if there's no further questions, I'll reserve the balance of my time. Thank you, Mr. Keller. Thank you, Your Honor. Ms. Greenwald. Your Honor, the District Court properly precluded the defendant's expert from testifying that it was an accepted industry-wide practice for loan officers not to re-verify information in packages received from other loan officers or real estate personnel. The District Court wasn't confused about the appropriate standard. It used the correct standard, and it zoomed right in on what was missing, and specifically what was missing was anything that tied this expert testimony about a purported non-verification practice and this particular defendant's intent, which was the purpose for which it was purportedly being offered. This wasn't a testimony, as I believe the Court pretty much recognized, this wasn't testimony about an industry standard. This was testimony supposedly about a practice, and there was no proffer that the expert had a basis for knowing what the verification practice was or wasn't at the mortgage, brokerage, or financial institutions that this defendant had worked at and this defendant was trained at, which were countrywide and first national. And the Court gave the defense an opportunity to provide more information. The Court specifically issued an order, give me what you've got to give me more of a basis here, and nothing more was proffered as to the defendant's own employers and training. Instead, what came back was proffering about the practice or the so-called practice at the lenders in this case, and particularly any proffer of information that how this expert supposedly knew about the practice at the lenders was based on some unspecified communications and meetings with some unidentified representatives and lenders on unspecified occasions. As the District Court recognized, the defendant himself never worked for these victim banks. He was never a loan officer. That's an interesting phrase, victim banks. Well, in this case they were, as the jury found, and there was no indication that these banks in this case had done anything incorrect. The defendant functioned by his own description and testimony. His position, even just the use of the phrase loan officer, while technically he had this title loan officer, as he himself described his position in his testimony, he was a mortgage broker. He didn't work for these banks. The expert's proffer almost reads as though he's envisioning someone who works for the victim lenders as a traditional loan officer. The defendant described himself really as a broker. He used the word broker in his testimony, who put together the lenders and the borrowers. So really, as the District Court found, the expert's testimony was both unreliable and irrelevant. In fact, at the time the District Court made its finding in this case, there wasn't even a proffer at that point that the defendant would produce any evidence or there would be any evidence that the defendant even relied on anyone, on any submissions from anyone else. Per his own confession and per the evidence that the government presented, had the defendant not testified, really the evidence was that he helped create all of this. Certainly Okulaja came to him, but there was no indication that the documents necessarily came from Okulaja as opposed to the defendant's own activity. So at the time the court's ruling, there's really nothing even to suggest there's any reliance on anyone else at that time. Ms. Greenwald, is there any sign that the district judge's pretrial ruling excluding Findley's testimony was tentative? You know what? I don't believe the judge did, but the government, in particular, that the judge said, and come back to me after your case or anything, but the government did. The government's initial response was, Your Honor, there's not even been a proffer here or any indication of this. Right, but for purposes of Rule 103, I would think we need to concentrate on what the judge said rather than... The judge, I do not believe, did at that point. She almost took it even assuming that such evidence came was how her opinion reads. However, however, and it's not the government's position that this issue is necessarily waived. But we would take, yes, we're not claiming waiver, but we would claim that it should be reviewed under a plain error standard because the defendant certainly, at once presenting that testimony, could revisit it. But the court need not even go there. We think the evidence is so clear here that under any standard, this was not an erroneous ruling and surely not under the district court's extremely wide discretion in ruling on expert witnesses. And in particular here, any error would be harmless. The evidence, which included the confession, which included all the circumstantial evidence in the case, was overwhelming. And in fact, the defendant, as I believe was pointed out in counsel's argument, did not testify that he even relied on this or was trained to rely on such a practice. His testimony was that it was common in the financial world for another lender or loan officer, for another loan officer or real estate personnel to bring you packages when they couldn't get through to somebody else and then for you to resubmit them and do things. But he discussed nothing about verification or practice with verification. So even in his own testimony, he didn't establish that kind of reliance that would make this testimony any more relevant. In terms of the sufficiency of the evidence, in his confession, just quoting from it, I submitted the applications for Jose Galindo even though both were for primary residence loans and the phone number listed for the borrower was Alonre Okulaja's cell phone number. I knew that some of the information was false, but I really just didn't want to know the truth on and on. The clear application of those lines is at the time he's submitting the application. In addition, the agent testified that when he's talking about having put down that both were for primary residences, that he admitted to him, this is the agent's testimony, that he admitted to him that there was no legitimate reason to put both being prime residents on two different applications. So viewed in its whole, both the actual written confession plus the additional information provided by the agent, the sequence of events is clear. Again, we're not saying the jury couldn't have tried to find, excuse me, found a different way, but certainly the evidence more than supported the jury's verdict because in addition to the confession, there was also so much circumstantial evidence, including the conflicting information on the face of the applications, providing Okulaja's phone number as that of the borrower, signing the application saying that he'd gotten the information directly from the borrower when in fact he hadn't. The list of lies just go on and on right from the face of the application. And to me, particularly to me, the thing most damning here is the idea of staggering these loans and structuring them in such a way that you go to all these different lenders for each condominium and they're happening within days, at most a week of each other, and not disclosing to each lender that these other loans were obtained. So unless the court has any further questions, we'd ask that you affirm the conviction in that sentence and rely on our brief for the other arguments. Thank you. Anything further, Mr. Keller? Just briefly, Your Honor. Just on the expert issue, I would just say that the jury needed to know that Mr. Vanni was not required to verify Okulaja's information. Context is critical in allowing the prosecution to eliminate that context. As if Vanni's submissions were in a vacuum, certainly save the prosecution's case, help the prosecution's case. If Vanni was not obligated to verify information... What is your source for arguing that he was not obligated to verify information? I would say it's based on Mr. Fenley's disclosures. No, as Fenley was described, all he was going to testify is that it was not normal to verify. And we're just back to the Lakeshore Drive example. It is not normal to drive 45, but it is legally required to drive 45. So what are you relying on for the proposition that he was not obligated to verify? Then I would change that language. I apologize. I would not say obligated, but not that it was not standard and that they were not... Right, but why is that a defense to a criminal charge that here we have a legal requirement that lots of people in the field disobey? Why would that be a defense? Because it's a specific intent crime and... All he has to do is know what the legal requirement is. Certainly, Your Honor. Once again, I would simply say that a criminal defendant has a constitutional right to present a defense and... Yes, but my question is, why is it a defense? Well, because it goes to Vonnie's state of mind. It sounds a little bit more like everybody else is out there doing the same thing I'm doing, so I shouldn't be held accountable. Everybody else is speeding, so the speed limit can't be enforced against me. We know that's a non-starter, although that mixed metaphor. Certainly, Your Honor. I have nothing further. I would simply ask that the court reverse. Thank you, Your Honor. All right, thank you very much. And, Mr. Kelleher, we appreciate your willingness to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement.